Roy P. WINDHAM et al., on behalf of themselves and all others similarly situated, Appellants,

v.

AMERICAN BRANDS, INC., et al., Appellees.

No. 75–2315.

United States Court of Appeals, Fourth Circuit.

Argued May 6, 1976.

Decided July 16, 1976.

E. N. Zeigler, Florence, S. C., (H. Page Dees, Florence, S. C., John A. Cochrane, John E. Thomas, St. Paul, Minn., J. Nat Hamrick, Rutherfordton, N. C., Robert C. Howison, Jr., Raleigh, N. C. and Frank M. Wooten, Jr., Greenville, N. C., on brief), for appellants.

Murray H. Bring, Atty., Arnold & Porter, Washington, D. C., (Willcox, Hardee, Palmer, O'Farrell, McLeod & Buyck, Florence, S. C., on brief), for Philip Morris Inc., appellees.

William Reynolds Williams, Asst. U. S. Atty., Columbia, S. C., and Edward M. Silverstein, Atty., Marketing Div., Office of Gen. Counsel, U. S. Dept. of Agriculture, Washington, D. C. (Mark W. Buyck, U. S. Atty., Columbia, S. C., James D. Keast, Gen. Counsel, J. Michael Kelly, Harold N. Carter, Asst. Gen. Counsels, John C. Chernauskas, Director, Marketing Div., Washington, D. C., on brief), for appellees.

Before BRYAN, Senior Circuit Judge, CRAVEN, Circuit Judge, and WYZANSKI, Senior District Judge.*

WYZANSKI, Senior District Judge*.

The issue before us is whether in this private action alleging violation of Sections 1 and 2 of the Sherman Anti-Trust Act, 15 U.S.C. §§ 1 and 2, the District Court abused its discretion in denying, with respect to all aspects of the case, class action certification under Fed.R.Civ.P. 23(b)(3).

July 29, 1974, six named plaintiffs, growers of flue-cured tobacco in South Carolina, complained that seven defendant tobacco companies and the Secretary of Agriculture of the United States conspired, in violation of the Sherman Act, (1) to rig bids and fix prices to force, at prices lower than would have been the situation in a free market, the sale of tobacco by tobacco farmers, including owners of land with tobacco allot-

---

* Sitting by designation.

ments, lessees of allotments, sharecroppers, and tenants, (2) to monopolize the warehouse auction markets for flue-cured tobacco by parallel bidding, collusive bidding, and percentage purchase agreements, and (3) to restrict arbitrarily the amount of flue-cured tobacco which could be sold per day and per week in the auction warehouses and to apportion the available government tobacco inspectors inequitably between South Carolina and Georgia.

October 17, 1974, the District Court, responding to a class action allegation in the complaint, issued a rule to show cause why an order should not be entered determining, pursuant to Fed.R.Civ.P. 23(a) and (b)(3), that this action be maintained on behalf of a purported class of more than 20,000 South Carolinians who from 1970 through 1974 sold, or had an economic interest in the sale of, flue-cured tobacco in South Carolina, and whose total claims aggregated, according to plaintiffs, more than $335,000,000.

The District Judge permitted the parties to engage in full discovery on the class action issues, presided at the deposition of more than 20 witnesses, admitted extensive documentary materials, and on September 26, 1975, filed a 29-page opinion containing full, precise, and apposite findings which, after careful analysis, led him to conclude that the case should not proceed as a class action because individual issues would predominate over common ones and because the case would be unmanageable as a class action.

Mindful of the weight which Fed.R.Civ.P. 52(a) demands be accorded to a District Court's findings "unless clearly erroneous," we first summarize what District Judge Chapman found on the basis of substantial evidence.

Flue-cured tobacco is a non-standardized product grown in South Carolina, Alabama, Florida, Georgia, North Carolina, and Virginia. It is sold almost exclusively at auctions at independent warehouses in each of those states except Alabama. It is sold in individual piles weighing about 200 pounds each.

In South Carolina there were at the time of the trial 36 tobacco warehouses in 11 different geographic markets. The number of warehouses conducting auctions in each geographic market varied from 2 to 7. Most of the flue-cured tobacco grown in South Carolina was sold there, but South Carolina growers also had sold large amounts of tobacco in other states.

The quality of tobacco is affected by moisture content, sand content, degree of ripeness, spoilage, disease, method of picking, method of curing, and other factors. The quality may reflect the skill of the farmer, the area of production, and other aspects of production. Quality obviously affects price. Each tobacco company has its own grading system, and, in addition, the government has a system of 161 grades, which it uses in establishing levels of price support.

Other findings of the judge relate to topics such as whether defendants increased their bids on low quality tobacco to affect prices on high quality tobacco, whether tobacco producers when dissatisfied with market bids sell to government-sponsored stabilization programs, and whether despite an alleged conspiracy covering all 11 markets some defendants bought at only some of those markets, or did not make always the same percentage of their purchases in the same markets, or paid for the same grade of tobacco different prices at different times in different places.

The judge, in the light of *Eisen v. Carlisle and Jacquelin*, 479 F.2d 1005 (C.A.2, 1973), vacated on other grounds, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (which held that it would be improper to allow a class as such to have a "fluid recovery" assessing gross damages to the class as a whole), also made findings that relate to the vast amount of evidence which probably would be required to prove the fact of impact of the alleged conspiracy upon *each* of the 20,000 proposed members of the class, and the facts with respect to the specific damage each of the 20,000 had individually sustained. But the findings do not address the question whether, if the sole issue be-

fore a court and jury were the existence of alleged conspiracies which constituted violations of the anti-trust laws, there would be a substantial difference in the quantum or character of the requisite proof if the plaintiffs included all 20,000 in a class action or only the 6 named plaintiffs.

The findings indicate that there may be among the potential members of the proposed class some, as the District Judges denominated them, "antagonisms" of interest, in the sense that, because of the quality of their tobacco, or their roles in the market, different individuals may have been differently affected by the alleged conspiracies. Obviously, however, these supposed antagonisms would not prove that defendants did or did not conspire; they would bear chiefly upon the measure of the impacts of the conspiracies, if any existed.

Moreover, with respect to impact and damages, the trial court took note of other problems. Plaintiffs had offered no proof that there is, and the judge did not believe that there was, any theoretical or practical over-all workable formula or method to aid in the computation of damages sustained by different individuals. The judge added that no expert could qualify to give opinions concerning the competitive prices of 161 different grades of flue-cured tobacco on each sales day, at each warehouse for each of the four years embraced by the complaint. In short, each of the 20,000 probable members of the class, in order to secure a favorable judgment for him, would require different, and perhaps voluminous, documentary evidence with respect to his individual transactions.

Against these findings of fact and comments thereon, and after concluding that the complaint stated claims within the jurisdiction of the court, upon which relief could be granted, and after considering plaintiffs' suggestion "in briefs and oral argument . . . that it would be helpful to try the issue of liability separate from the issue of damages," the District Judge addressed himself to the applicability to this case of Fed.R.Civ.P. 23(a) and (b)(3), the text of which provides:

(a) *Prerequisites to a Class Action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) *Class Actions Maintainable.* An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

With respect to the just quoted Rule 23(a), the District Court decided that (1) the proposed class was necessarily (apart from other factors) so numerous that joinder of all members would be impractical, (2) there are questions of law and fact common to the proposed class, (3) the claims of the representative parties are typical of the claims of the proposed class, and (4) the representative parties would fairly and adequately protect the interests of the proposed class. Hence, the District Court held that the prerequisites of Rule 23(a) had been satisfied.

But the Court then held that plaintiffs had failed to meet the requirements of Rule

23(b)(3) that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and effective adjudication of the controversy." In so holding, the Court gave consideration to what it called the "possibility of bifurcating this action, that is, planning to try the issue of liability separate from the issue of damages." Despite that possibility, the judge concluded that, largely because of the different impacts upon the 20,000 individuals and the elaborate documentary proof that would be needed to trace their transactions and their possible individual damages, "the problems of manageability" were such that plaintiffs' claim of a class action should be denied. Thereupon, the Court ordered dismissal of the complaint as to all others than the 6 named plaintiffs and entered a final judgment against such others.

Pursuant to Fed.R.Civ.P. 54(b), the District Court certified that final judgment to this Court.

■ We accept such certification as appropriate. *Katz v. Carte Blanche Corp.*, 496 F.2d 747 (C.A.3, 1974); *Hayes v. Sealtest Foods*, 396 F.2d 448 (C.A.3, 1968). See 9 J. Moore *Federal Practice*, para. 110.13[9], at p. 186 (2d ed. 1975).

■ On the merits, we approve of the District Judge's findings and conclusions that plaintiffs satisfied the prerequisites of Fed.R.Civ.P. 23(a), as an appropriate exercise of his discretion. What troubles us is the lower court's application of Fed.R.Civ.P. 23(b)(3). Of course, we are mindful that in this case we are not to approach the matter *de novo*, but to defer to the District Judge's exercise of discretion, unless we are convinced that he was plainly wrong. *Barnett v. W. T. Grant Co.*, 518 F.2d 543, 547 (C.A.4, 1975); *Cypress v. Newport News General & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (C.A.4, 1967); *Clark v. Watchie*, 513 F.2d 994, 1000 (C.A.9, 1975), *cert. denied*, 423 U.S. 841, 96 S.Ct. 72, 46 L.Ed.2d 60 (1975); *Price v. Lucky Stores, Inc.*, 501 F.2d 1177, 1179 (C.A.9, 1974); *Wilcox v. Commerce*

*Bank*, 474 F.2d 336, 342, 347 (C.A.10, 1973); *New York v. International Pipe & Ceramics Corp.*, 410 F.2d 295, 298 (C.A.2, 1969).

The District Court was fully aware that, among their suggestions, plaintiffs sought to have that Court segregate the issues as to whether defendants had conspired in the three ways alleged in the complaint, from the issues of which persons were caused to suffer injury from one or more of the conspiracies, and what damages, if any, each of those persons individually suffered.

Unfortunately, because of the plaintiffs' counsel and the District Court's use of the unnecessarily comprehensive term "liability," there was not in the lower court a sufficiently sharp distinction drawn between issues as to the alleged violations of the anti-trust laws, and issues as to causation. Had this line of differentiation been emphasized, the District Court would probably have seen the cross-light which is beamed from Section 5 of the Clayton Act of 1914, 38 Stat. 731, 15 U.S.C. § 16(a). Since that statute was adopted, it has been a Congressional policy that

"[a] final judgment or decree heretofore or hereafter rendered in any civil or criminal proceeding brought by or on behalf of the United States under the antitrust laws to the effect that a defendant has violated said laws shall be prima facie evidence against such defendant in any action or proceeding brought by any other party against such defendant under said laws or by the United States under section 15a of this title, as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto."

The importance of the statutory provision just quoted is well-known to those who have followed the course of private civil anti-trust proceedings in the federal courts in the last half century. To cite only one, but perhaps by no means in volume the least significant, set of cases applying the rule that a judgment in favor of the government is available in private litigation as *prima facie* evidence of violation of the

anti-trust laws, we refer to the literally hundreds of treble damage actions which drew sustenance from the judgments favorable to the government against leading motion picture producers who had violated the anti-trust laws by conspiracies involving block-booking, clearance practices, arbitration agreements, and other activities. *Paramount Famous Lasky Corp. v. United States*, 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145 (1930); *United States v. First National Pictures, Inc.*, 282 U.S. 44, 51 S.Ct. 45, 75 L.Ed. 151 (1930). (The hundreds of citations in Sheppard's *Federal Citations* and in the annotated versions of Title 15 of the United States Code show where those two cases have been applied.) Equally instructive are the private actions which built upon the judgment secured by the government in *United Shoe Machinery Corp. v. United States*, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954). See *Herman Schwabe v. United Shoe Machinery Corp.*, 274 F.2d 608 (C.A.2, 1960).

■ 15 U.S.C. § 16(a), quoted above, which was originally § 5 of the Clayton Act, implies more than it says. It indicates a general policy of aiding those who are injured by violations of anti-trust laws in ways which show Congressional sympathy for the usually small enterprise against the ordinarily large malefactor. As is sometimes said, there is beyond the law of the statute the equity of the statute: that is, the legislature has shown what policy it favors and this is a datum to be given great weight by the judiciary not only in the precise situations covered by the legislative act but in analogous situations where the judiciary has a freer hand but the policy considerations are similar to those in the area specifically covered by the legislative act.

To put the matter clearly and in direct relationship to the problem before us, there is discernible a public policy which tends to simplify the presentation of individual claims of damage caused by what has in a master suit been found to be a violation of the anti-trust laws.

■ We do not mean to imply that in each and every anti-trust case a trial court should allow plaintiffs to maintain, at least with respect to issues of alleged violation of the Sherman Act, 15 U.S.C. §§ 1 and 2 or cognate laws, a class action on behalf of others who meet the class standard of Fed. R.Civ.P. 23(a). There are distinguishable situations. See 3B J. Moore *Federal Practice*, para. 23.45[2], at pp. 23–759–762 (2d ed. 1975). What we do say is that there is almost a rebuttable presumption that such a class action should be allowed where there is a plausible claim of violation of the Sherman Act. Congress and the courts have frequently shown they regard the Sherman Act as an economic "charter of freedom" of hardly less than Constitutional dimensions. It deserves ungrudging, and, as is sometimes said, liberal reading to accomplish its purposes. Without for one moment intimating that the defendants in the case at bar are wrongdoers—an issue not yet canvassed by evidence, and one on which we have no opinion other than that the burden of proof is upon the plaintiffs to establish defendants' alleged violations of law—we are of the view that if defendants are proven to have been conspirators, the road to recovery by those who prove they were caused to suffer injury by the violators should be shortened by giving them the benefit of modern procedural devices such as a class action. Without such a short-cut, it might not be economically practical for a holder of a relatively small individual claim to get a recovery to which he is legally entitled.[1]

■ Approaching in that spirit the facts found in this case by the District Judge, we have concluded that it was an abuse of discretion of the District Court not to allow

1. The District Judge stated that the average claim would exceed $16,000, but he did not estimate the median amount. It was suggested on oral argument before us that some claims might be very large and that thousands would be much smaller than $16,000. The hope of recovering even three times $16,000, not to mention a smaller sum, would hardly lead a prudent man to begin an anti-trust suit.

a class action at least with respect to issues of alleged violation of the Sherman Act. As our review of the lower court's findings discloses, there was no substantial evidence which indicated that the trial of such issues of alleged violation would be noticeably prolonged, even if there were 20,000 plaintiffs instead of 6.

Assuredly the case with respect to defendants' alleged violations would not have been unmanageable merely because the number of plaintiffs was multiplied by the thousands. Whether defendants conspired as alleged may indeed be either unprovable or very hard to prove, but those difficulties relate principally to what defendants can be shown to have done or said. While proof as to what such violations, if they occurred, caused in the way of damage may become relevant to, and even to some degree intertwined with, issues of violation, nonetheless, if there is a bifurcated trial, with first a hearing only on the issues of violation, *vel non*, the extent of evidence with respect to intertwined matters can be appropriately limited by the common sense, skill, and discretion of the trial judge. He, like the jury, will initially be required to decide only whether defendants conspired as alleged.

Managerial difficulties are always present in big anti-trust cases. But the case at bar, by including a class of 20,000, will not present unusual complexities at least so long as only issues of violation are before the tribunal.

Obviously if plaintiffs cannot prove the alleged conspiracies, that ends the case. If they can, then the District Court, in its discretion, can decide whether the issues of causation and damage shall be disposed of by separate trials for each plaintiff, or whether there shall be one mass trial or several trials with plaintiffs grouped in subclasses which meet the standards of Rule 23(b)(3).

We find some support for our opinion in the following cases, none of which is, of course, precisely apposite. *West Virginia v. Charles Pfizer & Co.*, 314 F.Supp. 710 (S.D. N.Y.1970), *aff'd*, 440 F.2d 1079 (C.A.2, 1971); *In re Coordinated Pretrial Proceed-*

*ings in Antibiotic Anti-Trust Actions*, 333 F.Supp. 278 and 333 F.Supp. 285 (S.D.N.Y. 1971); *Eisen v. Carlisle and Jacquelin*, 52 F.R.D. 253 (S.D.N.Y.1971). However, regardless of the analogies, we rest our judgment principally on the directive force of Congressional and judicial policy in anti-trust litigation as applied to problems of class actions sought to be covered by Fed.R. Civ.P. 23(a) and (b)(3).

*Ordered that the judgment be reversed with opportunity to be allowed to plaintiffs to file in the District Court a motion pursuant to Fed.R.Civ.P. 42 seeking a separate trial of issues concerning defendants' alleged violations of the anti-trust law, and for further proceedings consistent with this opinion.*

ALBERT V. BRYAN, Senior Circuit Judge (dissenting):

Not in the slightest unappreciative of the majority's thoughtful penetration into the entirety of this case and of its careful positing of available separable issues, together with their distinctive adaptabilities, my difference with the opinion rests upon its own faithful recognition of both the force of the District Court's fact findings in themselves, F.R.Civ.P. 52, and the force of that Court's discretionary judgment upon them. *In re Cessna Aircraft Distributorship Antitrust Litigation*, 518 F.2d 213, 215 (8 Cir.), cert. denied, 423 U.S. 947, 96 S.Ct. 363, 46 L.Ed.2d 282 (1975); *City of New York v. International Pipe & Ceramics Corp.*, 410 F.2d 295, 298 (2 Cir. 1969).

With its factual recital unquestioned, for me the District Judge's decision is not enfeebled by an *abuse* of discretion. I track and stand on his comprehensive and closely scanned findings of fact and conclusions of law, q. v., and so I would affirm.