NATIONAL SUPER SPUDS, INC., et al., Plaintiffs,

v.

NEW YORK MERCANTILE EX-CHANGE et al., Defendants.

Nos. 76 Civ. 2375 (LFM), 76 Civ. 2554 (LFM), 76 Civ. 2571 (LFM) and 76 Civ. 2594 (LFM).

United States District Court, S. D. New York.

Aug. 15, 1977.

Pomerantz, Levy, Haudek & Block by Richard M. Meyer, New York City, Lippe, Ruskin & Schlissel, P. C., Mineola, N. Y., Hollinshead & Mendelson, Pittsburgh, Pa.,

Keenan & Pedersen, New York City, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for plaintiffs.

Dunnington, Bartholow & Miller by William M. Bradner, Jr., Richard E. Rieder, Edward T. McDermott and Steven E. Lewis, New York City, for defendants J. R. Simplot Co., J. R. Simplot, Simplot Industries, Inc. and C. L. Otter.

Rein Mound & Cotton by Maurice Mound, Cahill, Gordon & Reindel by William E. Hegerty, Charles Platto and Ruth D. MacNaughton, New York City, for defendant New York Mercantile Exchange.

Sidley & Austin, Chicago, Ill., Dewey, Ballantine, Bushby, Palmer & Wood by Ira Greenberg, New York City, for defendant Heinold Commodities, Inc.

Curtis, Mallet-Prevost, Colt & Mosle by Peter E. Fleming, Jr., and Samuel F. Abernethy, New York City, for defendants Peter J. Taggares, P. J. Taggares Co. and Sim Tag Farms.

Thompson & Mitchell by W. Stanley Walch, St. Louis, Mo., Barrett, Smith, Schapiro & Simon, New York City, for defendant Clayton Brokerage Co. of St. Louis, Inc.

## OPINION

MacMAHON, District Judge.

Plaintiffs move, pursuant to Rules 23(c)(1) and 53(e)(2), Fed.R.Civ.P., for an order confirming the decision and report of the Special Master, dated August 15, 1977 (the "report"), and determining that this consolidated action should proceed as a class action.

By orders dated September 24, 1976 and April 6, 1977, we appointed the Special Master for these designated class actions and for seven related cases and directed the Special Master, in addition to superintending pretrial discovery, to hear and report on the class action motion.

After conducting discovery on the class action issues, under the supervision of the Special Master, the parties presented voluminous briefs and exhibits to him on the motion. A hearing was held by the Special Master on June 17, 1977, and on August 15, 1977 he rendered an extensive and carefully reasoned report recommending that this consolidated action proceed as a class action.

After consideration of the materials presented on the instant motion, the decision of the Special Master and the papers submitted to him on the original motion for class determination, we agree with his recommendation and confirm his report.[1]

The first amended consolidated class action complaint (the "complaint") charges essentially that the short seller defendants [see report p. 4] combined and conspired to manipulate downward the price of May 1976 Maine potato futures contracts (the "May contracts"), in violation of the Commodity Exchange Act of 1922, as amended, 7 U.S.C. §§ 1 et seq., and Section 1 of the Sherman Act, 15 U.S.C. § 1.[2] Allegedly, the short broker defendants [see report p. 3] aided and abetted the unlawful activity of the short sellers and failed to place liquidating orders pursuant to the charter, bylaws and rules of the defendant New York Mercantile Exchange (the "Exchange"). Finally, the Exchange is charged with failing to supervise the market properly and enforce its own rules.

As a result of these acts, plaintiffs claim that prices of May contracts were artificially depressed throughout the relevant period. Plaintiffs seek to represent a class

1. Plaintiffs' principal argument in support of this motion is that defendants, having failed to file proper objections to the report, pursuant to Rule 53(e)(2), Fed.R.Civ.P., are estopped from contesting the findings and conclusions of the Special Master before the court. Regardless of the merits of this argument, we feel that it would be totally improper for the court to adopt such an approach, in view of the importance of this determination to the parties to this action, to the absent class members, and even to the court itself. Accordingly, we have considered on the merits all of the arguments of the parties relevant to the class action determination.

2. Jurisdiction is invoked under 28 U.S.C. § 1337 and Section 4 of the Clayton Act, 15 U.S.C. § 15.

consisting of all those who held a net long position in May contracts and who liquidated that position between April 13, 1976 and the close of trading on the Exchange on May 7, 1976, the last date of trading in the May contracts. It was such class that the Special Master recommended be certified.

■ Defendants, in opposition to this motion, rely primarily upon the proposition that there are inherent and irreconcilable conflicts between the members of the class precluding class treatment for lack of typical claims [Rule 23(a)(3)] and adequacy of representation [Rule 23(a)(4)]. These same arguments were raised before the Special Master, who considered them at length and concluded that they are "insubstantial" and no bar to class certification. We are equally unpersuaded and adopt the report as to these matters.

Defendants also raise the specter of unmanageability of this action as a class action [Rule 23(b)(3)(D)], claiming that such a multitude of individual issues pervades the lawsuit that the court cannot hope to focus the issues and prevent chaos except by the voluntary intervention of allegedly aggrieved persons. Thus, they assert, there can be no finding that common issues predominate. Again, this contention was raised before the Special Master and was rejected.

■ Defendants, however, now point to the recent Fourth Circuit en banc decision in *Windham v. American Brands, Inc.*, 565 F.2d 59 (4th Cir. 1977), upholding a trial court's denial of class status on the grounds of unmanageability.[3] The court in *Windham*, however, specifically held that the question of manageability is completely dependent upon the facts of the particular

case and is therefore committed to the sound discretion of the trial judge. In light of the allegations of the complaint and the facts as presented on the class motion, we find that this case is not subject to the same inconsistent claims as appeared in *Windham*.

Here, plaintiffs may establish "liability" by proving that the defendants engaged in the unlawful conspiracy alleged; that, as a result, the price of the May contracts throughout the relevant period was depressed below that which would have prevailed in the absence of such activity; and that plaintiffs liquidated their positions during the pendency of the conspiracy. These issues are common to all class members and are appropriate for class treatment. There will remain, of course, questions as to the specific *amount* of damages suffered by each class member, but these questions do not seem to be as extraordinarily confounding as defendants predict. The court is confident that, although complex, this case is manageable and that experienced counsel will be able to present the issues in understandable fashion.

We recognize that there are complicating factors by virtue of the defendants' counterclaims alleging a counter-conspiracy by certain "longs" to drive up the price of the May contracts. We have already held that these counterclaims shall be allowed to stand, noting that the Federal Rules provide sufficient procedural flexibility to enable the court to manage the litigation efficiently. *National Super Spuds v. New York Mercantile Exchange*, 75 F.R.D. 40 (S.D.N.Y.1977).[4] Defendants' papers contain noth-

---

3. The Special Master, in his report, suggested that the court could certify the question of the alleged conspiracy alone, leaving for later proceedings the question of causation and damages. This approach was adopted by the panel decision in *Windham v. American Brands, Inc.*, 539 F.2d 1016 (4th Cir. 1976). While the *en banc* decision reversed the panel's finding that the District Court had abused its discretion in not granting class status, 68 F.R.D. 641 (D.S.C. 1975), it did not comment specifically as to this approach in an appropriate case. In any event,

Rule 23(c)(4)(A) provides that a class action may be maintained as to particular issues.

4. Without anticipating trial strategy by the parties and assuming, *arguendo*, that plaintiffs carry their burden, it may be that proof by defendants of the existence of such a counter-conspiracy would be relevant to the trial of the liability issue. It may be proved that, as a result, the price of May contracts was equal to or even above that which would have prevailed in an unmanipulated market place. It is difficult to see, however, how proof of such a

ing to convince us that this litigation will be unmanageable.[5]

In any event, the parties may rest assured that, if it should later appear that class status was improvidently granted, the court will not hesitate to "alter or amend" its decision, pursuant to Rule 23(c)(1), to eliminate the problem either by the creation of subclasses, the designation of specific issues only for class treatment, or, if necessary, the decertification of the class.

Accordingly, we grant plaintiffs' motion for an order confirming the report, which we expressly adopt, and annex a copy as part of this opinion.

Settle order on notice providing for appropriate notice to class members.

## APPENDIX

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------- x
                                            :
NATIONAL SUPER SPUDS, INC., et al.,         :
                                            :
                    Plaintiffs,             :
                                            :
    -against-                               :
                                            :
NEW YORK MERCANTILE EXCHANGE, et al.,       :
                                            :
                    Defendants.             :
                                            :
------------------------------------------- x
```

### DECISION AND REPORT OF SPECIAL MASTER

Plaintiffs move, pursuant to Rule 23(c)(1), Fed.R.Civ.P., for an order determining that this action shall proceed as a class action. By orders, dated September 24, 1976 and April 6, 1977, the undersigned was appointed Special Master for the actions designated as class actions and for seven related cases, and in addition to superintending pretrial discovery, was directed to hear and report on the class action motion.

A hearing upon this motion was held on June 17, 1977, and voluminous papers have been submitted by the parties. After due consideration thereof, and the oral argument by counsel, the Special Master submits this report upon the class action motion.

This action arises from the events which resulted in perhaps one of the major defaults in the history of the New York Mercantile Exchange ("Exchange"), namely, the failure to deliver on some 1,000 open futures contracts for Maine potatoes in May 1976. The default itself, however, is not the basis for the claims asserted, but the prior trading of the contracts on the Exchange and certain other alleged activities.

The First Amended Consolidated Class Action Complaint (the "Complaint")[1] alleges that this action arises under the Commodity Exchange Act of 1922, as amended, 7 U.S.C. §§ 1 *et seq.* (the "Commodity Act"), the rules and regulations of the Commodity Futures Trading Commission ("CFTC"), 17 C.F.R. §§ 1.1 *et seq.*, the Charter, By-Laws and Rules of the defendant New York Mercantile Exchange and the Sherman Anti-Trust Act, 15 U.S.C. §§ 1 *et seq.* (the "Sherman Act"). Jurisdiction is invoked under 28 U.S.C. § 1337 and Section 4 of the Clayton Act, 15 U.S.C. § 15.

counter-conspiracy would be any different if a class is certified or if trial proceeds on behalf of individual named plaintiffs. The participation of individual class members in such a counter-conspiracy would probably be relevant only as to the question of his right to recover any damages.

5. Indeed, recognition of the complications which do exist in this action and the related cases prompted the court to appoint a Special Master.

1. In addition to the four consolidated actions now under consideration, which are denominated as class actions, there are seven other individual actions pending before the Court arising out of trading in the May Contracts.

The Commodity Futures Trading Commission filed three separate administrative complaints against (1) the Exchange, (2) certain short sellers, including some of the defendants now before us, and (3) certain persons holding long positions in the May 1976 Maine Potatoes Futures Contracts. See *In re New York Mercantile Exchange*, CFTC Docket No. 77–14; *In re Peter J. Taggares, et al.*, CFTC Docket No. 77–13; *In re Harold Collins, et al.*, CFTC Docket No. 77–15. The CFTC complaints were made public while the instant motion was *sub judice*. They were called to the Special Master's attention by both sides to this litigation, and each seeks to derive assistance from the CFTC allegations.

Plaintiffs purchased May 1976 Maine Potato Futures Contracts (the "May Contracts") at various times and liquidated their long position between April 13, 1976 and the close of trading on the Exchange on May 7, 1976 (the "Class Period").

The defendants are divided into three groups:

(1) The Exchange is a "contract market", designated by the CFTC pursuant to Section 5 of the Commodity Act (7 U.S.C. § 7), through which transactions in various futures contracts, including Maine Potatoes Futures Contracts, are consummated.

(2) Clayton Brokerage Co. of St. Louis, Inc. ("Clayton"), Heinold Commodities Inc. ("Heinold"), Thompson & McKinnon, Auchincloss, Kohlmeyer, Inc. ("Thompson & McKinnon"), and Pressner Trading Corp. ("Pressner"), (hereinafter collectively referred to as the "Short Brokers"), are members of the Exchange, and "members of a contract market" and "futures commissions merchants" as defined in Section 2(a)(1) of the Commodity Act (7 U.S.C. § 2). These defendants are alleged to be the brokers through which the third group of defendants transacted their various trades in May Contracts on the Exchange.

(3) Jack Richard Simplot, J. R. Simplot Co., Simplot Industries, Inc., Peter J. Taggares, P. J. Taggares Co., C. L. Otter, Simtag Farms, Kenneth Ramm, A & B Farms Inc., Hugh V. Glenn, Gearhart Farming, Inc. and Ed McKay (hereinafter collectively referred to as the "Short Sellers"), are the third group, who sold May Contracts short and are said to have failed to liquidate their short position by May 7, 1976 as required by Exchange Rules.

Essentially, the Complaint alleges that the defendant Short Sellers combined and conspired to manipulate the price of May Contracts in violation of the Commodity Act, 7 U.S.C. §§ 6(b) and 13(b), and Section 1 of the Sherman Act, 15 U.S.C. § 1. It is asserted that these defendants utilized a variety of devices to depress the price of May Contracts artificially. They are charged with (1) failing to liquidate their large short positions in May Contracts when they knew that there were insufficient potatoes available to fill the open contracts, (2) continuing to sell additional May Contracts at any price to lower the price by increased market activity, (3) sending roller cars of fresh potatoes to the East Coast to lower the "spot price" and thereby lower the May Contract price, and (4) using various other methods, including violations of the position and trading limits imposed by the Regulations of the CFTC (17 C.F.R. § 150.10).

The defendant Short Brokers are charged with aiding and abetting the scheme of the Short Sellers, and with failing to place liquidating orders pursuant to Section 44.02 of the Charter, By-Laws and Rules of the Exchange.

The Exchange is charged with having failed to supervise the market and enforce its own rules, thus fostering the scheme of the Short Sellers.

As a result of defendants' alleged acts, it is claimed that the prices of the May Contracts were artificially depressed during the period from April 13, 1976 to the end of trading in May Contracts on May 7, 1976.

Defendants have denied all material allegations of the Complaint, and have asserted an array of affirmative defenses, cross-claims and counterclaims, including counterclaims against certain named persons and corporations, purported to be members of the alleged class, who are not named parties plaintiff.[2]

Plaintiffs move for an order pursuant to Rule 23, determining that this action shall proceed as a class action on behalf of themselves and those whom they purport to represent. The putative class is defined as all those who held a net long position in May

---

2. Heinold, Ramm, Gearhart and the Exchange have filed counterclaims. The Simplot defendants and the Taggares defendants have raised nearly identical claims by separate suits. See *J. R. Simplot Co. v. New York Mercantile Exchange*, 76 Civ. 3904 (LFM); *P. J. Taggares Company v. Harold Collins*, 76 Civ. 4377 (LFM). A motion to strike the counterclaims was denied by this Court's decision of June 15, 1977.

Contracts and who liquidated that position between April 13, 1976 and the close of trading on the Exchange on May 7, 1976.

Defendants vigorously oppose this motion, contending that class certification is inappropriate since (i) plaintiffs have not satisfied the numerosity requirement, Rule 23(a)(1); (ii) plaintiffs' claims are not typical, Rule 23(a)(3); and (iii) plaintiffs will not be adequate representatives for the absent members, Rule 23(a)(4). In addition, as plaintiffs seek class determination pursuant to Rule 23(b)(3), defendants contend that common questions do not predominate, and that a class action is not the superior method for adjudicating this controversy. Thus, virtually every possible Rule 23 question is presented on this motion.

It appears that this is a matter of first impression in this district, and indeed within this circuit. In fact, research reveals no case in which class action certification has ever been granted in a case brought under the Commodity Act. There is nothing, however, on the face of Rule 23 which places the "atypical" case beyond its purview. Accordingly, this action will be treated no differently from any "normal" putative class action on a similar application.

We begin, of course, with the proposition that the party seeking class status has the burden of demonstrating that the requirements of Rule 23(a) and at least one of the subdivisions of Rule 23(b) are satisfied. Each case must be examined on its own, since no mechanical application of the Rule is permissible. Furthermore, although we are not permitted to inquire preliminarily into the merits of plaintiffs' case, *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), we are not limited solely to the face of the pleadings, *Huff v. N. D. Cass Company of Alabama*, 485 F.2d 710, 713 (5th Cir. 1973).[3]

"[A]n analysis of the issues and the nature of proof which will be required at trial is directly relevant to a determination of whether the matters in dispute are principally individual in nature or are susceptible of proof equally applicable to all class members." *Nguyen Da Yen v. Kissinger*, 70 F.R.D. 656, 660–61 (N.D.Cal. 1976).

See also, *Gneiting v. Taggares*, 62 F.R.D. 405, 406 (D.Idaho 1973); *Free World Foreign Cars, Inc. v. Alfa Romeo*, 55 F.R.D. 26, 29 (S.D.N.Y.1972).

Preliminarily, it is axiomatic that before class action status can be granted, the class must be defined and the representative party must be a member of it. *Jenkins v. Fidelity Bank*, 365 F.Supp. 1391, 1397 (E.D. Pa.1973); 3B *J. Moore, Federal Practice* ¶ 23.04 pp. 22–23, 23–253 (2d ed. 1974). Defendants contend, however, that plaintiffs have failed to define the putative class precisely.[4]

As noted earlier, the Complaint defines the class as all persons "who held a net long position in [May Maine Potato] Contracts and who liquidated their long position in said Contracts between April 13, 1976 and the close of trading on the Exchange on May 7, 1976." This definition is sufficiently precise to enable the Court to determine which persons are class members. See 7 *Wright & Miller, Federal Practice & Procedure* § 1760 at p. 581. Compare *Vietnam Veterans Against the War v. Benecke*, 63 F.R.D. 675 (W.D.Mo.1974); *Rappaport v. Katz*, 62 F.R.D. 512 (S.D.N.Y.1974). Moreover, each of the named plaintiffs appears to be a member of the class.[5] Plaintiffs have, therefore, fulfilled this basic requirement.

---

3. The parties, under our supervision, have undertaken a considerable amount of discovery on the class action issue, the fruits of which have been presented for consideration on this motion.

4. Not all defendants have raised all of the same arguments in opposition to the motion. However, since they all share at least a common interest in defeating class certification, each

objection of general applicability raised by any one defendant will be considered to have been raised by all.

5. It is unnecessary to identify each class member at this time. *Dolgow v. Anderson*, 43 F.R.D. 472, 492 (E.D.N.Y.1968); *Fischer v. Kletz*, 41 F.R.D. 377, 384 (S.D.N.Y.1966).

Defendants question the April 13, 1976 date for the beginning of the class period. On that date, the U.S. Department of Agriculture issued its Stocks Report which indicated that the total amount of Maine potatoes in storage was only 7.4 million cwt., an amount which is supposedly well below average. Plaintiffs claim that defendants' alleged manipulation must have commenced at least by that date because the price did not rise as it normally would have been expected to. In addition, it is alleged in the Complaint that between April 14 and May 7, 1976 the CFTC brought the large short position of short sellers to the attention of Exchange officials.

Defendants argue that the April 13 date is inappropriate because the Stocks Report actually underestimated the supply of potatoes by 2 million cwt. They claim that this fact gives rise to individual questions as to each class member's knowledge of the inaccuracy of the Stocks Report. If a long buyer knew of the plentiful supply of potatoes, defendants contend, then he could not base a claim of manipulation upon the Short Sellers' inability to purchase potatoes on the open market.

This argument would require an impermissible preliminary inquiry into the merits, as to the accuracy of the Stocks Report. See *Halverson v. Convenient Food Mart, Inc.*, 458 F.2d 927, 932 (7th Cir. 1972). In any event, even assuming the inaccuracy of the Stocks Report, we fail to see what relevance a class member's knowledge of that fact has to this determination or to the case. Plaintiffs claim that defendants undertook a direct manipulation of the price of the May Contracts through their trading activity, and that one purpose of the manipulation was to offset the anticipated effect of the Stocks Report. Even if a particular class member knew the true amount of potatoes on hand, it seems incredible to contend that such a person has no claim if plaintiffs can prove that defendants' alleged machinations depressed the price of May Contracts below that which would have prevailed in the absence of the manipulation.

If all the requirements for class action status are present, plaintiffs should be given an opportunity to substantiate their allegations. *Hawk Industries, Inc. v. Bausch & Lomb, Inc.*, 59 F.R.D. 619, 622 (S.D.N.Y. 1973). In short, the April 13, 1976 date appears at this point, to be an appropriate starting point for the Class Period, subject, of course, to future redefinition as may be required. Rule 23(c)(3), Fed.R.Civ.P.[6]

We will consider now the requirements of Rule 23.

### A. Numerosity

The first requirement of Rule 23(a) is that "the class is so numerous that joinder of all members is impracticable". Plaintiffs estimate that there are at least 500 to 1,000 class members, a sufficient number to satisfy this requirement.

Defendants contend, however, that plaintiffs have engaged in pure uncorroborated speculation of the number of potential class members, a practice soundly criticized in several cases. See e. g., *Demarco v. Edens*, 390 F.2d 836, 845 (2d Cir. 1968); *Cannon v. Texas Gulf Sulphur Co.*, 53 F.R.D. 216 (S.D.N.Y.1971); *Kinzler v. New York Stock Exchange*, 53 F.R.D. 75 (S.D.N.Y.1971).

In response, various affidavits have been submitted, indicating that plaintiffs' counsel have been contacted by some 20 persons from around the United States and Europe, other than the named plaintiffs, who appear to be members of the putative class.[7]

---

**6.** Apropos to this discussion, the CFTC complaint against the "Short Sellers" (see footnote p. 2 *supra*) alleges in part that (1) on March 29, 1976 Simplot and Taggares agreed to trade the May Contract together through their various accounts, and Simplot provided Taggares with $1,000,000 to establish a "significant short position," (2) from March 29 through May 7, 1976 Simplot and Taggares acquired a "dominant short position" in May Contracts, and (3) at least from April 27, through May 7, 1976 the Short Sellers "singly and in concert . . . attempted to manipulate downward the price of the Contract on the Exchange . . . ."

**7.** The affidavit of Richard M. Meyer states that approximately 154 accounts in May Contracts were liquidated in whole or in part at Horn-

In addition, this case involves numerous May Contracts traded upon a national exchange.

The test to be applied in this situation was succinctly stated in *Nguyen Da Yen v. Kissinger, supra,* 70 F.R.D. at 661:

"In order for the Court to be able to determine whether the class is so numerous that joinder of all the members would be impracticable, plaintiffs must show *some evidence of or reasonably estimate* the number of class members. Mere speculation as to satisfaction of this numerosity requirement does not satisfy Rule 23(a)(1)." (emphasis added)

The submissions of plaintiffs demonstrate convincingly that one may "reasonably estimate" the class to be at least sufficiently large to make joinder of all members impracticable.

### B. *The existence of common questions*

Defendants have not disputed the existence of "questions of law or fact common to the class". Rule 23(a)(2). These questions include (i) whether the Short Sellers engaged in a conspiracy to depress the price of May Contracts; (ii) whether the Short Brokers aided and abetted the Short Sellers in effectuating this conspiracy; (iii) whether the Exchange failed to supervise the market adequately and to enforce its own rules and regulations; and (iv) whether the alleged actions of defendants resulted in a depressed price for May Contracts during the class period.

### C. *Typicality of the claims of the representative parties, and adequacy of representation*

Rule 23(a)(3) requires a finding that the "claims or defenses of the representative parties are typical of the claims or defenses of the class," and Rule 23(a)(4) requires a finding that the "representative parties will fairly and adequately protect the interests of the class." These requirements overlap to the extent that they are both designed to ensure that the representative parties do not have interests antagonistic to those whom they seek to represent. Such coincidence of interests is necessary to afford absent class members due process, since they will be bound by *res judicata* to the judgment in the case.

Putting aside, for the moment, a discussion of any supposed antagonism, we note that in order to be an adequate representative, "the primary criterion is the forthrightness and vigor with which the representative party can be expected to assert and defend the interests of the members of the class." *Mersay v. First Republic Corp. of America,* 43 F.R.D. 465, 470 (S.D.N.Y. 1968). The remaining named plaintiffs [8] appear to be committed to the continued prosecution of this suit, and affidavits have been submitted by plaintiffs certifying that they have the financial means to prosecute the action and have undertaken to be responsible for payment of the costs if class status is granted. In addition, plaintiffs' attorneys are "qualified, experienced and generally able to conduct the proposed litigation." *Eisen v. Carlisle & Jacquelin,* 391 F.2d 555, 562 (2d Cir. 1968).

Defendants assert that there are numerous conflicts of interest between plaintiffs and members of the proposed class, and among various groups within the class. None of the plaintiffs, it is claimed, is an adequate or typical representative of the class.

Only a very small percentage of futures contracts will result in the actual delivery of the fresh product.[9] The vast bulk of the trading is done by persons with other interests in entering the market. Investors in

---

blower & Weeks—Hemphill, Noyes, Inc. during the class period.

**8.** Richard Welts has withdrawn from participation in this action as a named plaintiff with the approval of the Court.

**9.** In this case, of the many contracts bought and sold, there were approximately 1900 open contracts in Maine potatoes at the close of trading on May 7, 1976. Of these, it is said that approximately 1000 contracts representing 50 million pounds of Maine potatoes were in default on May 25, 1976, the last date for delivery on the May Contracts.

commodities futures markets have been categorized into several groups, but two classifications predominate:

1. *Speculators*—These investors have no interest in actually delivering or receiving the commodities whose futures contracts they purchase or sell. They have neither a use for the product, nor the capacity to produce it. They are, rather, persons whose interest is limited solely to obtaining a profit due to the fluctuating price of the futures contract. Thus, a speculator who purchases a long position in a commodity futures contract will receive a profit if the futures price rises (at which point he can offset his position, and fix his profit, by selling an equal number of contracts), and a speculator who sells a short position will receive a profit if the futures price subsequently declines (at which point, he cam similarly offset his position, and fix his profit by purchasing an equal number of contracts). All of the named plaintiffs describe themselves as speculators.

2. *Hedgers*—These investors are in the actual business of buying or selling the commodities whose futures contracts they purchase or sell. Their basic purpose is to offset the vagaries of price fluctuations in the cash market of the product, by taking a similar position in the futures market, since cash prices and futures prices generally move in tandem. Thus, for example, a processor who will need to buy a certain amount of potatoes for his business during May will buy an equivalent amount of futures contracts. If the cash price rises (as does the futures price), he can offset the increased price in the cash commodity by liquidating his position in the futures market. Similarly, if the cash price declines (as does the futures price), his "profit" in the cash market will be offset by liquidating his short futures position. The same consideration in mirror image would apply to a farmer who will want to sell potatoes during

May. It is clear, then, that the hedger's predominant interest is not to gamble on making a profit, as such, in the futures market, but to achieve price stability in the cash product.[10]

However, despite the apparent difference in basic motivation for trading in the futures market, it is not clear that the interests of speculators in this lawsuit are inimical to those of hedgers. The complaint alleges that defendants conspired to depress the market price in potato futures contracts. If true, both a long hedger and a long speculator who closed out their positions received a price below that which would have prevailed in a market free from manipulation. Even if a hedger may have offset part of this loss by a lower price in the fresh market, there is no indication at this point that the cash price moved exactly in tandem with the futures price. All of this appears in the end to be nothing more than a question of damages, which can be handled at a later point on a case-by-case basis or by means of a formula which can take into account short positions or purchases in the fresh market. See e. g. *Gold Strike Stamp Co. v. Christensen*, 436 F.2d 791, 798 (10th Cir. 1970); *Aamco Automatic Transmissions, Inc. v. Taylor*, 67 F.R.D. 440, 450 (E.D.Pa.1975); *Barr v. WUI/TAS*, 66 F.R.D. 109, 115 (S.D.N.Y.1975).

Defendants raise another supposed conflict in that hedgers are claimed to be dependent upon the continued existence of the Exchange to achieve price stability in their commodities. Since the Exchange is a defendant and since it is claimed that an adverse judgment could possibly put it out of business, defendants argue that speculators cannot represent hedgers, analogizing their respective positions to former and present franchisees in a suit against the franchisor. See e. g. *Free World Foreign Cars, Inc. v. Alfa Romeo*, 55 F.R.D. 26 (S.D. N.Y.1972).

10. A trader is not limited to one category, speculator or hedger, at all times or even at any one time, but may be a hybrid between the two. He may hedge on a particular amount of fresh potatoes, for example, which he will need to buy at some time, and speculate at the same time by buying contracts for an additional amount. On the one hand, he protects himself from fluctuations in the cash crop, while on the other, he gambles that the futures price will increase.

Plaintiffs respond that *Alfa Romeo* has been limited in its holding solely to franchisee-franchisor cases. See *Hi-Co Enterprises, Inc. v. ConAgra, Inc.*, 75 F.R.D. 628 (S.D.Ga.1976); *Shelter Realty Corp. v. Allied Maintenance Corp.*, 75 F.R.D. 34 (S.D.N.Y.1977).

While we think it unnecessary to adopt plaintiffs' position, we find that there has been an insufficient showing that there exists between hedger and the Exchange the "symbiotic relationship" which defendants urge. While franchisees derive a great benefit because of the public recognition of the franchisor's name and the reputation of its products, the Exchange serves as a mere marketplace for the hedgers, and, although it is the only national exchange dealing in Maine potato futures contracts, there are several similar exchanges which could serve this function. Furthermore, this argument depends upon the unsubstantiated assumption that the Exchange could not withstand a judgment against it. Accordingly, we cannot accept this reasoning to deny class status.

Defendants raise a similar claim of conflict in that the class may include both members and non-members of the Exchange. Under the Rules of the Exchange, a member who sues the Exchange unsuccessfully is liable to it for attorney's fees. Also, if judgment is granted against the Exchange, it might have to assess its members in order to pay. These facts, it is argued, create a conflict precluding certification of a class which includes both groups.

A similar argument was made in *Umbriac v. American Snacks, Inc.*, 388 F.Supp. 265 (E.D.Pa.1975). There, the class which plaintiff sought to represent included both those who had sold the defendant's debentures and those who still retained them. It was claimed that the latter group would be reluctant to pursue the lawsuit because a judgment against the defendant could affect their financial interest. The court rejected this argument stating that the supposed conflict of interest

"is grounded upon speculative assumption that ASI debenture holders will choose to forego their legal interest in possible damages for securities fraud against ASI in favor of protecting their present financial interest with ASI. Individual class members may ultimately arrive at the decision that defendant predicts, but I cannot make any assumptions as to whether all, most, or only a few of these debenture holders would prefer to throw their lot with ASI rather than with the named plaintiffs. In any case, each will have an opportunity to opt out of the class under Fed.R.Civ.P. 23(c)(2) if a class determination is made." 388 F.Supp. at 274

To similar effect, see *Chevalier v. Baird Savings Ass'n*, 72 F.R.D. 140 (E.D.Pa.1976); *In re National Student Marketing Litigation*, CCH Fed.Sec.L.Rep. (1973 Decisions) ¶ 94,165 at 94,729 (D.D.C.1973); *Hawk Industries, Inc. v. Bausch & Lomb, Inc.*, 59 F.R.D. 619, 623 (S.D.N.Y.1973).

The rationale of *Umbriac* is persuasive. Defendants' argument is based solely upon speculation that members of the Exchange would not wish to pursue their legal rights because of the possibility of injury to their financial interest from a judgment against the Exchange. As in *Umbriac*, this is a decision to be made individually by the Exchange members by the opt-out procedure if the class is certified.

Defendants also urge that there are inherent conflicts within the proposed class due to the fact that purported class members established their long interests and then liquidated their position at different times. Thus, a class member who bought a May Contract before the beginning of the Class Period would have a differing interest from one who bought during the Class Period. The former is interested in proving that defendants' manipulation occurred at any time during the period prior to his liquidating sale. The latter, on the other hand, would want to prove that defendants' manipulation was effective after he had purchased his interest.

In addition, it is claimed that persons who liquidated their positions early in the class period, in order to maximize their damages,

will want to prove that the conspiracy was most effective at the beginning of the class period, while those who liquidated near the end of the period will want to minimize the conspiracy's effects during the early part and maximize it at the later point. These conflicts, it is claimed, demonstrate a divergence of interests among all potential class members precluding class certification.

In support of this argument, defendants rely principally upon *Robinson v. Penn Central Co.*, 58 F.R.D. 436 (S.D.N.Y.1973), a case brought under Section 10(b) of the Securities Exchange Act of 1934. There, Judge Lasker denied without prejudice plaintiffs' class action motion, in large part, because of an apparent lack of typicality due to the fact that plaintiffs purchased their stock at various times.

The defendants in *Aboudi v. Daroff*, 65 F.R.D. 388 (S.D.N.Y.1974), made a similar argument with less success. There the plaintiff alleged that defendants had issued false and misleading financial reports, and sought to represent a class of purchasers of a certain common stock during the period from December 10, 1969 through March 14, 1972. The court, in granting class certification, stated that the important fact was that plaintiff had pleaded a continuing course of conduct which resulted in an inflated market price over the entire period. *Robinson, supra* was distinguishable because Judge Lasker was "specifically considering the plaintiffs' claim without regard to the conspiracy allegations in the complaint". 65 F.R.D. at 392.[11]

The plaintiffs in *Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975), sought to represent all purchasers of Ampex Corporation securities during a 27 month period, in a Section 10(b) case claiming various misrepresentations of financial information. The defendant contended, as in the instant case, that there were conflicts among class members because of the differing times of purchase and sale. The court rejected this argument outright, noting:

"The Rule provides the mechanism of subsequent creation of subclasses, Rule 23(c)(4), to deal with latent conflicts which may surface as the suit progresses. As a result, courts have generally declined to consider conflicts, particularly as they regard damages, sufficient to defeat class action status at the outset unless the conflict is apparent, imminent, and on an issue at the very heart of the suit." (citations omitted) 524 F.2d at 909

To the same effect, see also *The Munsey Trust v. Sycor, Inc.*, Docket No. 76 Civ. 5182 LFM (S.D.N.Y., June 20, 1977).

The reasoning of *Aboudi* and *Blackie* applies with greater force in the present case where the class period is less than 4 weeks long. Plaintiffs have pleaded a continuing course of conduct over the period in question resulting in a depressed price for May Contracts, and the Court has great flexibility under Rule 23 to deal with conflicts if and when they may arise. Defendants' argument of potential time conflicts is, therefore, insufficient to deny class status.

It is clear from the foregoing that the various claims of "conflicts" are insubstantial. The interests of the plaintiffs and of all class members in proving a conspiracy which depressed the price of May Contracts throughout the Class Period are identical. Accordingly, plaintiffs' claims are typical of the proposed class, and plaintiffs are adequate representatives.

D. *Predominance of common questions and superiority of class action.*

Plaintiffs seek certification of the class pursuant to Rule 23(b)(3), which requires a finding that

"the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

Defendants contend that this case, by its very nature, is replete with individual questions such that class status is unwarranted.

11. The court also distinguished another case relied upon by defendants here, *Richland v.*

*Cheatham*, 272 F.Supp. 148 (S.D.N.Y.1967). See 65 F.R.D. at 391–392.

Defendants assert that even if plaintiffs establish the existence of a conspiracy, they would still be required to prove that each class member was injured by it. This task is further complicated by the fact that traders in futures contracts have differing characteristics and motivations.[12]

In support of this position, defendants rely principally upon *Gneiting v. Taggares*, 62 F.R.D. 405 (D.Idaho 1973). There, plaintiffs alleged that they had acquired "short or hedge" positions in May 1971 Idaho Russet potatoes contracts, and that they were forced to close out these positions at manipulated prices. Plaintiffs sued under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2).

The court denied plaintiffs' motion for certification of a class, finding that the claim of conspiracy did not predominate

"over the more expansive issue of whether, and in what circumstances, individual plaintiffs can assert that the alleged violation proximately caused an injury to them". 62 F.R.D. at 407

In our view, *Gneiting* presents an overly restrictive perspective in suits of this type. In the first place, it could be argued that proof of the conspiracy and of a resulting depression of the market price is sufficient to allow a jury to infer that anyone who sold at such a price was thereby injured.

This type of approach was adopted by the court in *In re Master Key Antitrust Litigation*, 70 F.R.D. 23 (D.Conn.) *appeal dismissed*, 528 F.2d 5 (2d Cir. 1975). There, the defendants argued that plaintiffs would have to prove damage to each plaintiff in order to establish liability in a case alleging a conspiracy to stabilize prices and restrict competition in master key systems. The district court rejected this argument as a "red herring" and went on to state:

"If the plaintiffs introduce proof (or if it may be stipulated) at the liability stage that they bought master key systems and that the defendants engaged in a pervasive nationwide course of action that had the effect of stabilizing prices at supracompetitive levels, the jury may conclude that the defendants' conduct caused injury to each plaintiff. The amount of that injury may be computed at a separate trial on the damage issues." 70 F.R.D. at 26 n.3.

The Second Circuit, in dismissing the appeal from the order certifying a class in *Master Key*, specifically approved of this formulation.

"If the appellees establish at the trial for liability that the defendants engaged in an unlawful national conspiracy which had the effect of stabilizing prices above competitive levels, and further establish that the appellees were consumers of that product, we would think that the jury could reasonably conclude that appellants' conduct caused injury to each appellee. The amount of such injury could then be computed at a separate trial for damages . . . ." (citations omitted) 528 F.2d at 12 n.11.

See also *Chevalier v. Baird Savings Ass'n.*, 72 F.R.D. 140 (E.D.Pa.1976); *In re Sugar Industry Antitrust Litigation*, 73 F.R.D. 322 (E.D.Pa.1976).

Secondly, even if this approach could not be used in this case, the court could still certify this action as to the questions of the existence of the conspiracy and its effect on the market price, leaving for later proceedings the questions of causation and the amount of individual damages. This procedure was expressly adopted by the Fourth

---

**12.** In addition to hedgers and speculators, already discussed, other types of traders are:

1. Spreaders or straddlers—a kind of speculator who takes opposite positions in two related markets, e. g. they will buy a Maine potato contract and sell an Idaho potato contract. A profit will be realized only if the "spread" between the two transactions becomes larger. Thus, they are not specifically concerned with the price of a contract at any particular time,

but with the difference in price between two contracts.

2. Day traders and scalpers—kinds of speculators who maintain many small positions for short periods of time. They will make a profit by successfully predicting short term trends in the market, and are, therefore, generally unconcerned with the price of a contract at a particular time.

Circuit, per Judge Wyzanski, in *Windham v. American Brands Inc.*, 539 F.2d 1016 (4th Cir. 1976) (rehearing en banc pending). The court found that the district court abused its discretion when it denied plaintiffs' motion for class certification, and held that class status was warranted even if only for the question of the existence of the alleged conspiracy. If plaintiffs can establish the conspiracy,

> "then the District Court, in its discretion, can decide whether the issue of causation and damage shall be disposed of by separate trials for each plaintiff, or whether there shall be one mass trial or several trials with plaintiffs grouped in subclasses which meet the standards of Rule 23(b)(3)." 539 F.2d at 1022.[13]

Thus, it appears that defendants' objection is not well founded and should not prevent certification of a class.

Defendants next argue that the counterclaims and affirmative defenses against individual members of the proposed class, alleging that they attempted to manipulate the price of May Contracts upwards, presents numerous individual questions, precluding class status.[14]

Like objections have resulted in denial of class status in some cases. In *Cotchett v. Avis Rent A Car Systems*, 56 F.R.D. 549 (S.D.N.Y.1972), plaintiffs sued under Sections 1 and 2 of the Sherman Act, claiming that defendant automobile rental companies had placed a $1 surcharge on all car rentals. Defendants counterclaimed against an estimated 60,000 individual class members for unpaid tickets. The Court denied plaintiffs' motion for class status, noting that the presence of the counterclaims raised "the likelihood of a substantial number of class members seeking to be excluded from the action", 56 F.R.D. at 553.

Similarly, in *Plekowski v. Ralston Purina Co.*, 68 F.R.D. 443 (M.D.Ga.1975), plaintiffs charged defendants with an illegal tying arrangement. Defendants raised the affirmative defense of release and accord since several hundred putative class members had executed releases. The Court, in denying class certification, noted that this raised individual questions of whether a class member executed the release, whether it was valid, and whether it covered the claims raised in the main suit.

Plaintiffs cite several cases to the effect that counterclaims against absent class members are inappropriate and should be stricken. See, e. g. *Donson Stores, Inc. v. American Bakeries Co.*, 58 F.R.D. 485 (S.D. N.Y.1973); *Dennis v. Saks & Co.*, 1975–2 Trade Cases ¶ 60,396 at 66,749 (S.D.N.Y. 1975); *In re Sugar Antitrust Litigation*, 73 F.R.D. 322 (E.D.Pa.1976); *Weit v. Continental Illinois Nat'l Bank & Trust Co.*, 60 F.R.D. 5 (N.D.Ill.1973).

The Court, in the instant case, by opinion dated June 15, 1977, has already ruled that the counterclaims raised by defendants shall be allowed to stand. In reaching this decision, the Court stated:

> "We think there is less to this debate than meets the eye. Even those cases squarely holding that absent class members are not 'opposing parties' indicated that such counterclaims *would* be considered at a later stage of the litigation, i. e., in the event liability is established on the primary complaint. *Donson Stores, supra; Weit, supra; In re Sugar Litigation, supra.* Fairly read, those rulings merely demonstrate a technique for managing and organizing, for trial purposes, complex cases with numerous claims and counterclaims. The cases denying class action certification, in part because there were potential or actual counterclaims against class members, reflect a similar concern about managing those cases where a myriad of individual issues indicated that class action treatment was inappropriate."

---

**13.** To the same effect in a Section 10(b) case, see *Werfel v. Kramarsky*, 61 F.R.D. 674, 682 (S.D.N.Y.1974).

**14.** The CFTC complaint against persons holding long positions, (see footnote p. 2 *supra*) alleges in large part the same facts constituting a "long conspiracy" as are alleged by defendants.

It appears that the mere existence of the counterclaims, no matter how meritorious, is no obstacle to the certification of a class. As Judge MacMahon has noted, the procedural flexibility of the Federal Rules leaves ample room to dispose of all the issues in this case in as efficient a manner as possible. In short, the individual questions which may arise from the counterclaims will not predominate over the issues common to the entire class.

Finally, defendants assert that a class action is not the superior method for adjudicating this controversy, citing *Plekowski v. Ralston Purina Co., supra,* 68 F.R.D. 443; *Cotchett v. Avis Rent A Car Systems, supra,* 56 F.R.D. 549; *Gneiting v. Taggares, supra,* 62 F.R.D. 405; *United Egg Producers v. Bauer Int'l Corp.,* 312 F.Supp. 319 (S.D.N.Y.1970).

We disagree. Each class member has an identical interest in proving the existence of the alleged conspiracy among the Short Sellers and Short Brokers, the lack of proper supervision by the Exchange, and the resulting depression in the price of May Contracts. Thus, to this extent, the interest of each member in controlling the litigation is minimal. In addition, there are probably included within the class many small investors whose individual claims would be too small to warrant litigation on their own behalf. Denial of class action status would effectively bar these individuals from asserting their rights. Furthermore, while there are now pending seven other lawsuits concerning the trading of May Contracts and the subsequent default, all are before Judge MacMahon and have been assigned to the Special Master for pretrial purposes. Thus, all litigation involving the matters in dispute here are already concentrated into a single forum. Lastly, we foresee no unusual difficulties in managing this suit as a class action. Accordingly, all the requirements of Rule 23(b)(3) have been met.

The Exchange has raised certain objections to class certification which are peculiar to itself, asserting that it is necessary in multiple defendant suits "to define the class of plaintiffs to whom each defendant may prove liable." *Elkind v. Liggett & Myers, Inc.,* 66 F.R.D. 36, 39 (S.D.N.Y.1975). It claims that the Complaint makes no allegations of specific wrongdoing by the Exchange prior to the period of May 5–7, 1976. Accordingly, those class members who liquidated their positions prior to that time would have no claim against the Exchange. Moreover, at oral argument on this motion, the Exchange asserted that it could not be liable for any acts or omissions occurring prior to the last 10 minutes of trading on May 7, 1976, since only at that time under Exchange Rules are liquidating orders required to be placed.

Inspection of the Complaint belies these contentions. The Exchange is charged in "Count VI" with failing to report violations of the Commodity Act, to direct the placement of liquidating orders for accounts which it should have known would default, to perform its duties as a contract market and to exercise due care to halt manipulative conduct. Furthermore, it is alleged that the Exchange was made aware of the substantial short position of the Short Sellers and Short Brokers, by CFTC personnel between April 14 and May 7, 1976, and that, as a result of the Exchange's acts and/or omissions, the price of May Contracts was depressed from April 13 through May 7, 1976. These allegations form a sufficient basis to grant class certification as against the Exchange coextensive with that against the other defendants. Facts which may be revealed through discovery will or will not support the allegations so made, but that is of no concern at this point.

Furthermore, the CFTC has filed an administrative complaint against the Exchange, alleging in part that:

(1) from March 25, 1976 through May 6, 1976 "the Exchange had undertaken a system of surveillance of the [May] Contracts whereby it would seek to detect concentrated long and short positions";

(2) from April 27, 1976 through May 7, 1976, the Exchange knew that certain individuals, including the defendant Short Sellers, held a large percentage of the short contracts and

(3) that the Exchange knew from at least April 29, 1976 that it was highly questionable whether the Short Sellers had any intention to make delivery on their open positions if not liquidated.

If upon further proceedings in this suit, any one of these dates is found to be more appropriate with regard to the Exchange, the Court can redefine the class as against it or establish a subclass.

Finally, the Exchange asserts that plaintiffs and the class have no claim for relief against it based upon allegations that it failed to enforce CFTC Regulation § 150.10 which establishes trading limits. The Exchange contends that it has no responsibility to enforce those limits under the Commodity Act or the regulations of the CFTC since it does not receive customer trading reports.

This argument, however attractive, is inappropriate on the instant application. Indeed, it has been held that class status may be properly granted even if the complaint could be dismissed for failure to state a claim. See *Umbriac v. American Snacks, Inc., supra,* 388 F.Supp. at 273; *Kahan v. Rosenstiel,* 424 F.2d 161, (2d Cir.), *cert. denied* 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970). In fact, this question is an additional reason to certify a class as to the Exchange. It is common to the class, and if decided as matter of law as the Exchange asserts, it would be res judicata against all members of the class.

### CONCLUSION

Accordingly, plaintiffs motion for an order, pursuant to Rule 23(c)(1), Fed.R.Civ.P., determining that this consolidated action should proceed as a class action should be granted. The class should be defined as all persons who held a net long position in May 1976 Maine Potato Futures Contracts, and who liquidated their position between April 13, 1976 and the end of trading on the Exchange on May 7, 1976.

DATED: New York, New York
August 15, 1977

s/ James B. Kilsheimer III
s/J JAMES B. KILSHEIMER III
Special Master