**Charles S. FOLTZ, et al., Plaintiffs,**

v.

**U.S. NEWS & WORLD REPORT, INC., et al., Defendants.**

**Civ. A. No. 84–0447.**

United States District Court, District of Columbia.

June 26, 1986.

Alan Raywid, John D. Seiver, Susan P. Baxter, Frances T. Chetwynd, Margaret E. Haering, Cole, Raywid & Braverman, Washington, D.C., for plaintiffs Foltz, Handleman, Price, Williamson.

Avis Black, Washington, D.C., for defendant-intervenor Save the Fund.

Leslie A. Nicholson, Jr., Hannah E.M. Lieberman, Thomas J. Catliota, Jonathan T. Cain, Washington, D.C., for defendants U.S. News, Madana Realty.

Lawrence Latto, William Galeota, Julie Melamud, Shea & Gardner, Washington, D.C., for defendant Profit-Sharing Plan.

Richard J. Wertheimer, Hadrian Katz, Edward Wolf, Washington, D.C., for defendants Directors.

Willis B. Snell, Willard K. Tom, Steuart H. Tomsen, Eric N. Miller, Washington,

D.C., for defendant The American Appraisal Associates, Inc.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, Senior District Judge:

On September 10, 1984, this matter was certified to proceed as a class action suit. This Memorandum Opinion addresses a recently filed motion of the U.S. News defendants, the director defendants and American Appraisal Associates, Inc., requesting the Court to decertify the class or, alternatively, to create subclasses to be represented by separate counsel. Pleadings in support of the motion were subsequently filed by the U.S. News Profit-Sharing Plan ("Plan") and defendant-intervenor, Save-the-Fund.

> The class was defined to include
>
> all persons who retired from employment with, or were otherwise separated as employees of, U.S. News & World Report, Inc. ... from 1975 to 1981, and who during their tenure as employees were shareholders of the Company, participants in the Company's Profit-Sharing Plan, or beneficial owners of the stock of the Company; and who, upon their retirement or separation from the Company, sold to the Company their legal or beneficial interest in the Company's stock or surrendered their interest in the Company's Profit-Sharing Plan, as the case may be....

That certification was expressly made conditional upon the ability of the class as defined to continue to meet the criteria of Rule 23, Fed.R.Civ.P. Shortly thereafter, the Court expanded the class to include those employees who separated from U.S. News in 1974 and issued a Memorandum

Opinion in support of its earlier order of class certification. 106 F.R.D. 338 (D.D.C. 1984). Again, that determination of class status was "provisional, and [subject to] modifi[cation] in light of subsequent proceedings." *Id.* at 342.[1] The class membership now totals some 230 former employees of U.S. News.

Defendants contend that irreconcilable conflicts of interest among the class plaintiffs have been brought to light over the course of pretrial discovery that justify the motion for decertification. The motion cannot be lightly considered for, if granted, it would seriously affect the future course and continuation of this litigation.

The legal memoranda in support of and in opposition to the motion and the oral arguments of counsel have been fully considered. For the reasons set out below, the Court determines that the defendants' motion should be **denied**.

## BACKGROUND

This litigation has generated several amended complaints and numerous opinions,[2] each dealing with various aspects of the factual and legal issues arising from the underlying claims. Plaintiffs' Fifth Amended Complaint charges that U.S. News & World Report, Inc. ("U.S. News" or "Company"), eight former members of its Board of Directors, Madana Realty Company ("Madana"),[3] American Appraisal Associates, Inc. and the Plan individually and collectively worked to undervalue the Company's assets and thus to depress the level of benefits received by plaintiffs upon their separation from employment. Those benefits were contained in and disbursed from two distinct retirement plans maintained by U.S. News.

The first, a stock bonus plan, was established in 1962 in conjunction with the trans-

---

**1.** In subsequent orders of August 28, 1985 and May 30, 1986, the class membership was modified to exclude five former members of the U.S. News Board of Directors because their interests varied from and were possibly antagonistic to those of the remaining class members.

**2.** *See* prior Opinions of this Court considering the parties' cross-motions for summary judgment, 627 F.Supp. 1143 (1986); plaintiffs' mo-

tion for preliminary injunction, 613 F.Supp. 634 (1985); 608 F.Supp. 1332 (1985), that of the Court of Appeals remanding to this Court, 760 F.2d 1300 (D.C.Cir.1985), as well as the Opinion of this Court issued June 12, 1986 in *Estate of Ben Grant v. U.S. News & World Report, Inc., et al.,* 639 F.Supp. 342.

**3.** Madana was at the relevant time a wholly-owned subsidiary of U.S. News.

fer of the beneficial ownership of the Company to its employees. It served as the vehicle through which an employee became a stockholder and secured an equity interest in the Company. Under the plan, each employee received at regular intervals a number of shares of common stock, according to a predetermined formula based on his salary and tenure and the appraised value of the U.S. News stock. The shares were not transferable by the employee.

The second, the Profit-Sharing Plan, held a 50,000 share block of the Company's Class A stock, as well as a limited portfolio of investment securities. In addition, the Plan received cash contributions from U.S. News, in accordance with a formula set out in the Plan instrument. The Plan owned its shares for the benefit of individual employee-participants. Each Plan member received an undivided interest in Plan assets, based upon the member's salary and term of service. Upon separation, the member was entitled to liquidate his Plan account by selecting one of three options: lump-sum settlement, purchase of an annuity, or continued participation in the investment fortunes of the Plan.

When an employee left U.S. News, he was required to offer his bonus shares back to the Company in addition to being entitled to liquidate his Plan account. At such time it thus was necessary to determine the value of the bonus shares held by the employee and the Class A stock held by the Plan.[4] Generally, the price offered by the Company for the bonus shares, based on a current appraised value, was accepted by the departing employee. Because the stock was closely held and not publicly traded, American Appraisal Associates, Inc., an outside appraisal firm, was retained to conduct annual appraisals. The development, preparation and results of those appraisals are a principal source of controversy in this litigation. Plaintiffs assert that, to their financial detriment, the

appraisal procedures failed to give fair and adequate consideration to the substantial real estate holdings of U.S. News in the West End of Washington, D.C. It was these holdings that accounted for the dramatic increase in the value of U.S. News stock in 1984 when the Company was sold to Mortimer Zuckerman.[5] Because of this sharp increase in value, plaintiffs charge that they received grossly undervalued benefits as compared with the cash proceeds and benefits received by U.S. News employees at the time of the sale. The bone of contention, then, is the rapid appreciation of the U.S. News stock, attributable mainly to the meteoric rise in value of the Company's real estate holdings.

Class counsel urge that this appreciation in value should have been realized and evenly accounted for throughout the eight-year class period and that, hence, the value of the Company's stock was depressed for that entire period. In arguing for decertification, defendants point out that advocacy of such a theory would necessarily pit one group of class plaintiffs against another. They assert that such antagonisms within the class would necessarily adversely affect class certification. These contentions were advanced by the defendants at the time that class certification was initially considered. At that time, the Court concluded that an assessment of such an argument would be more appropriately deferred until discovery was completed. 106 F.R.D. at 340–42. Feeling that that time has now come—now that plaintiffs' theories as to liability and damages and the opinions of their expert witnesses have been ascertained—defendants renew their arguments through the present motion to decertify. Those arguments are briefly summarized in the succeeding sections of this Opinion.

## A. Conflicts Alleged as to the Stock Bonus Plan

As noted previously, a participant in the stock bonus plan was awarded a number of

---

**4.** The common and Class A stock were treated as having equal value.

**5.** At that time Mortimer Zuckerman paid approximately $2,800 per share for the outstanding stock. Some three years prior to the sale,

U.S. News entered into a series of joint venture agreements with Boston Properties, Inc., a Zuckerman concern, all for the purpose of developing the West End real estate holdings.

bonus shares on a regular basis, in accordance with a predetermined formula. According to that formula, the number of shares awarded varied inversely as the appraised value of the Company's stock. Hence, defendants argue that if the stock were undervalued in every year—including that in which any given employee received his bonus shares—that employee ought to have received fewer bonus shares. As a result, his total recovery would be reduced, because any incremental increase in the value of the stock redeemed would be applied against a fewer number of shares received. To avoid this problem, then, a member of the class would want to demonstrate at trial that, while the Company's stock was undervalued at the time that he redeemed his shares, it was properly valued when he received them. Yet, because members of the class received and redeemed shares during different years, defendants point out, antagonisms would arise within the class. A class member who received shares in 1976 which he redeemed in 1981, for instance, would have interests in conflict with a member who redeemed his shares in 1976. The 1981 class member would want to prove that the stock was properly valued in 1976, while the 1976 class member would naturally want to demonstrate the opposite. Defendants point to numerous such conflicts within the 230–odd member class.

Moreover, defendants contend that such conflicts would cut across class years. Their reasoning is premised on the notion that a class representative for any given year is only interested in proving two things: first, that the Company's stock was undervalued in the year that he and the class members he represents were separated, and second, that the stock was properly valued when he received his bonus shares. However, he is not necessarily concerned about proving that it was properly valued in years that his fellow class-year members received *their* stock. Hence, because each named plaintiff does not have an incentive to prove all the elements of the claims asserted by those he represents, defendants assert that he is not an adequate class representative.

### B. Conflicts Alleged as to the Profit-Sharing Plan

As with those conflicts alleged with respect to the stock bonus plan, defendants point to a possible twofold conflict among the interests of former members of the Profit-Sharing Plan, arising from the two theories of damages asserted by plaintiffs. One theory advanced is that plaintiffs are "continuing participants" in the Plan to the extent of their unpaid balances. In other words, because they feel that they have not received all benefit payments due, they claim that the balance of benefits to which they are entitled remain in the Plan and that, hence, they are entitled to share in the appreciation of the Plan assets attributable to the sale of the Company. In the early stages of this litigation, the initial damage theory advanced by plaintiffs depended upon a calculation of benefits due plus accrued interest ("benefits plus interest"). Defendants maintain that under either theory, irreconcilable conflicts exist among class members at the liability stage of this proceeding that render continued certification inappropriate.

As an initial matter, however, U.S. News and other defendants contend that at the damages stage of this proceeding, the class would be split over the choice of which theory of damages to pursue. On basis of figures adopted from plaintiffs' data, defendants maintain that members of the class who separated from U.S. News between 1979 and 1981 would be better off under the benefits plus interest theory, while those who left earlier would prefer relying upon the continuing participation theory. Yet, granting that this may be the case, there is no reason why any such problem could not be resolved at the damages stage of this proceeding, perhaps by resort to subclassing.

### 1. Conflicts in connection with the "continuing participation" theory

Under plaintiffs' "continuing participation" theory, members of each class

year continue to share in the appreciation of the Plan assets. As a result, under this theory, some members stand to lose as others gain. Those who separated in earlier years would see their interests diminished by payouts to those leaving subsequently; hence, they would want to prove that undervaluation in subsequent years was *de minimis.* Conversely, the interests of those separating in later years would be reduced by payouts made to those who left earlier; they, then, would want to demonstrate that the stock was properly valued until the time just prior to their separation. In short, members of every class year would be pitted against members of every other class year, with members of each attempting to concentrate the alleged undervaluation of the Company's stock into the period just prior to their separation.

### 2. Conflicts in connection with the "benefits plus interest" theory

Under the benefits plus interest theory, conflicts arise among class members who retired in different years because of the fact that a dollar of appreciation can be distributed but once. As a result, an individual who separated in any given year would want to concentrate the appreciation of the Plan assets into the immediately preceding year by arguing that the U.S. News stock was properly valued up until that time. His interests thus conflict with those of all class members who retired in prior years, who would gain nothing if he were successful in his presentation. Such a situation again pits members of every class year against those of every other class year.

### C. Conflicts as to Each Plan Taken Together

Under the assumptions outlined above, each member of the stock bonus plan

would want to demonstrate that the U.S. News stock was improperly valued when he redeemed his bonus shares, but properly valued when he received them. Each member of the Profit-Sharing Plan would want to concentrate the appreciation of its assets into the year immediately preceding that in which he left the Company. A member of both would thus want to argue that the Company's stock was properly valued up until the year immediately preceding his separation in order to maximize his recovery. And because members of the class left the Company in different years, defendants conclude, the adoption of recovery maximizing positions by each would result in a fragmented class that should be decertified.

### ANALYSIS

Arguing from their analytical framework, defendants strongly suggest the existence of substantial conflicts—at least in theory—among the class members. Whether such conflicts are sufficiently concrete to warrant decertification, however, is another matter. After full consideration, the Court concludes that they are not.

### A. Conflicts With Respect to the Stock Bonus Plan

As noted *supra,* conflicts seem to arise with respect to the stock bonus plan because, in any given year, some class members received while others redeemed their bonus shares so that different members would thus want to argue conflicting theories of valuation and liability for that year. Yet it is important to bear in mind that the instances of *conflict*—whether apparent or actual—are limited to possible antagonisms among, and not *within,* class years.[6] Defendants assert that a class representative

---

**6.** Conflict *within* a class year with respect to the stock bonus plan could arise only between a member who both received and redeemed his shares in that year, on the one hand, and his fellow members of that year, on the other. Yet a class member in that situation would be indif-

ferent as to whether undervaluation were proven or not, for any incremental increase in the value of his shares would be offset by a commensurate decrease in the number of shares issued him, with the result that he would receive no net gain or loss.

would not necessarily have the incentive to prove all the elements—in other words, the requisite mix of proper valuation and undervaluation—necessary to prove the claims of the class members he represents and would thus be an inadequate representative, citing *Weisberg v. APL Corp.*, 76 F.R.D. 233, 238 (E.D.N.Y.1977). That reasoning is highly unpersuasive, however, under the facts of the present case, even as they are characterized by defendants. If it is true that a member of both the stock bonus and Profit-Sharing plans would want to demonstrate that the U.S. News stock was properly valued in every year except that immediately preceding his separation,[7] then the representative of any class year would necessarily want to prove the elements necessary to the claims of persons who redeemed their bonus shares in that year at the same time that he proves his own claim. In other words, he would want to demonstrate that the Company's stock was *properly* valued in whatever years they *received* their shares, while undervalued in the year they all redeemed them. Any conflicts that exist with respect to the stock bonus plan, then, do not cut across class years.

Still, there remains the question of those conflicts posited to exist among the class years. Those conflicts, according to defendants, would naturally set each of the class representatives at odds with his fellows, with the result that the class would become fragmented, at least into eight subclasses corresponding to the eight class years. As plaintiffs point out, however, the prudent course for any given class representative to take is not necessarily to attempt to maximize his and his class' recovery by taking the kind of extreme position that defendants suggest that he would want to take. To advocate such a position could very well be to risk ultimate defeat at trial, as the class representatives collide with one another in an attempt to prove that the U.S. News stock was properly valued in one year but not another. In other words, each class representative could come to the conclusion that he would be better off working in conjunction with his fellows to demonstrate that the Company's stock was undervalued in every year, rather than setting out on a separate tack.[8]

Although defendants assert that there is no authority supporting plaintiffs' position that the individual interests of the class members should be subordinated to a greater common interest, plainly that is not the case. Plaintiffs have cited a number of cases, dealing with both securities and commodities trading, in which conflicts of the type that defendants here posit existed, but in which the courts nevertheless deemed certification to have been appropriate. *See, e.g., Blackie v. Barrack,* 524 F.2d 891 (9th Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976); *Gordon v. Hunt,* 98 F.R.D. 573 (S.D.N.Y.1983); *National Super Spuds v. New York Mercantile Exchange,* 77 F.R.D. 361 (S.D.N.Y. 1977); *Simon v. Westinghouse Elec. Corp.,* 73 F.R.D. 480 (E.D.Pa.1977). In each of the cases cited, the timing of certain events and the significance attached to those events bore on the success that each member of the class would have in maximizing his recovery. In this regard, *Blackie* is instructive. In that case, a class was certified to represent all purchasers of the defendant-issuer's securities within a certain period of time during which the plaintiffs contended that information concerning the true financial condition of the issuer was withheld. The *Blackie* Court recognized that, theoretically, a plaintiff who both purchased and sold the defendant's securities within the class period would want to maximize the impact of any corrective, deflationary measure taken by the defendant just prior to his sale, while his

---

7. *See supra* at 53.

8. The Court does not mean to suggest, however, that class counsel should necessarily abdicate his role as the formulator of the appropriate litigation strategy in favor of the class representatives. What legal theories to present remain in his special province of expertise, although input from the named plaintiffs is sometimes helpful. *See generally* Rhode, *Class Conflicts in Class Actions,* 34 Stan.L.Rev. 1183 (1982).

purchaser would want to prove that the price at which he bought was as overinflated as possible. 524 F.2d at 908. In rejecting the defendants' argument, the court found that any conflict was "substantially outweighed by the class members' common interests[,]" *id.* at 909, and that "[e]very class member share[d] an overriding common interest in establishing the existence and materiality of misrepresentations ... throughout the class period." *Id.* Moreover, at least one court has noted that the adoption of a position such as that asserted here by defendants would preclude the use of class actions in securities fraud cases. *Simon,* 73 F.R.D. at 484.[9]

In short, there is ample authority for holding that a commonality of interest in demonstrating aggregate liability may outweigh interests of individual class members in pursuing their own theoretically recovery-maximizing positions. Accordingly, as to the stock bonus plan, the conflicts posited to exist by defendants do not preclude continued class certification.[10]

**B. Conflicts With Respect to the Profit-Sharing Plan**

As outlined previously, a member of the Profit-Sharing Plan—whether or not he is also a member of the stock bonus plan—would want to demonstrate, in order to maximize his recovery, that the U.S. News stock was properly valued until the year immediately preceding his separation. This holds true regardless of the particular theory of damages—"benefits plus interests" or "continuing participation"—that is being

pursued. Yet the same rationale for rejecting defendants' arguments that conflicts with respect to the stock bonus plan preclude continued certification apply as well here. If plaintiffs are to avoid tripping over one another at trial, they must join together in presenting a coherent and credible theory of liability to the trier of fact. Thus, their common interests again predominate over whatever individual interests they might have in attempting to maximize their individual recoveries.

One issue that defendants raise, however, does give the Court pause. They point out that class members who left U.S. News in the later part of the class period could successfully argue that the real estate—the Company's primary asset—was properly valued until a period shortly before their retirement and that, prior to that time, the Company's real estate development plans were too inchoate to merit greater consideration in the annual appraisals. Thus, argue defendants, members who separated in later years would be better off pursuing their interests individually. Yet, if the class representative for 1981 or 1980 could make such an argument, then so too could the representative for 1979 or 1978. The ultimate result, then, would be the same type of fragmentation that would tend to defeat plaintiffs' demonstration of liability that has been previously identified. It would therefore *not* be in the interests of members of different class years to select a discrete issue with regard to liability and to then run with it in different directions.[11] Class counsel has instead devel-

---

**9.** The *Simon* court rejected the argument that conflicts between those who sold securities within the class period and those who held their shares, and between those who sold their shares and those who purchased from them, would bar class certification. 73 F.R.D. at 484. However, the court did exclude from the class purchasers of securities other than common stock, *id.,* as well as those who purchased after the date on which the named plaintiffs made their last purchases, *id.* at 485, on the grounds that the named plaintiffs could not adequately represent their interests.

**10.** Accordingly, the Court does not reach plaintiffs' contention that defendants are estopped

from arguing that the Court should readjust the number of shares issued plaintiffs and that, hence, no conflicts would arise because all plaintiffs would retain the number of shares originally issued, regardless of a finding of proper or improper valuation during the years of issuance.

**11.** This is not to say that if, upon communication with class counsel, a class representative decides that his interests would be better served by separate representation, such representation would be denied. Indeed, the Court urges class counsel to be candid with the named plaintiffs with respect to such possible divergences of interest.

oped a coherent theory of liability that will both preserve the class and render plaintiffs' presentation at trial more credible.

## C. Equitable Considerations

Finally, it is worth considering what would be the practical effect on the future course of this litigation if defendants' motion were granted. Decertification could generate several results, none of which are desirable. There is more than a possibility that this litigation would be fragmented into individual claims, presenting an array of unwieldly and time-consuming proceedings brought by a host of individual claimants. The multiplicity of plaintiffs would generate a great deal of wasted effort and would impose heavily on the resources of the Court. At the other extreme, there is the not remote possibility that many of the claimants simply would not pursue the matter. Those persons would be deprived of the benefits and advantages of a class action and would be frustrated in their efforts to obtain relief.

In short, decertification of the class or its division into subclasses would solve at best a theoretical concern, while creating a morass of very real problems.

### CONCLUSION

The Court recognizes that it often falls to the lot of the defendants in a class action proceeding to point out possible conflicts within the class that preclude class representation. *See* Rhode, *Class Conflicts in Class Actions*, 34 Stan.L.Rev. 1183, 1202–21 (1982). Even so, not every good-faith effort on the part of a class action defendant will be equally meritorious. On balance, the Court concludes that the law and the interests of justice require that class status be maintained.

Accordingly, it is this 26 day of June, 1986,

### ORDERED

That defendants' motion is **denied**; and

That the above-captioned matter may continue to proceed as a class action.