### In re SUMITOMO COPPER LITIGATION.

#### No. 96 Civ. 4584(MP).

United States District Court, S.D. New York.

June 26, 2001.

### ORDER NO. 104

POLLACK, Senior District Judge.

This matter is before the Court following two further settlements accomplished by counsel for plaintiffs.[1] Based on the

1. The earlier settlements herein were made with **Sumitomo Corporation** ("Sumitomo") and **Sumitomo Corporation of America** ("SCOA"), which paid a Settlement Amount of Ninety–Nine Million (**$99,000,000**) Dollars; **Morgan Stanley & Co. Incorporated** ("Morgan Stanley"), which paid a Settlement Amount of One Million (**$1,000,000**) Dollars; **Merrill Lynch & Co., Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Merrill Lynch Commodity Financing Inc., and Merrill Lynch Pierce Fenner & Smith (Brokers & Dealers) Limited** (the "Merrill Lynch defendants"), which paid a Settlement Amount of Eighteen Million One Hundred Thousand (**$18,100,000**) Dollars; and **Global**

platform created by counsel in the earlier settlements, they proceeded against further defendants on amended complaints and counsel's efforts have resulted in the establishment of additional Funds for the benefit of the Class totaling approximately $15,495,000. Counsel were previously compensated for their services and expenses incurred on the earlier settlements recovered for the Class. They now by Fee Petition seek fair compensation for their additional services and expenses related to the latest recoveries.

The additional settlement recoveries involved **J.P. Morgan Inc.** and **Morgan Guaranty Trust Company of New York (collectively "J.P. Morgan" or "Morgan")**, which have paid a Settlement Amount of Ten Million Seven Hundred Fifty Thousand ($10,750,000) Dollars, and **Credit Lyonnais Rouse Limited ("CLR")** which has paid a Settlement Amount of Three Million Nine Hundred Thousand **($3,900,000)** Dollars. The Funds were all placed into respective escrow accounts and invested in United States Treasury bills (maturing October 25, 2001) pursuant to the terms of the respective Settlement Agreements.

The additional services for which compensation is now being sought occurred between July 10, 1999 and May 10, 2001 based on the new claims against the two new defendants, CLR and J.P. Morgan. In addition, there presently is approximately $30,017 (in aggregate) in cash invested in the U.S. Trust money market. The total on hand at the present time is thus approximately $15,664,005. From this total after deducting approximately $200,000 for taxes, the value of the Settlement Fund on June 21, 2001 will be an amount in excess of $15,495,000. It is against this total that the present application for fees to counsel is based.

The CLR and J.P. Morgan settlements will provide claiming Class members with more than the average payout in securities fraud class actions.

Combined with the record-breaking settlements approved earlier herein, referred to above in footnote one, the CLR and J.P. Morgan settlements will probably provide Class members with an excess of 100% of the high measure of their losses (excluding prejudgment interest). This result is in part due to the fact that interest has been accruing on the paid-in amounts of the settlements.

It has been reported reliably that the average payout in securities fraud class actions typically is only 7–15% of Class members' losses. On the basis of this report, the new settlements with J.P. Morgan and CLR will, by themselves, apparently provide claiming Class members with a greater payout on their losses than is provided on average securities fraud class action settlements.

Counsel for the Class faced a very heavy burden in establishing these additional settlements referred to herein. At the very outset of the prosecution of the claims against CLR and J.P. Morgan, the defendants' initial response was an attack on Petitioners under Rule 11 of the Federal Rules of Civil Procedure ("FRCP") which was made by CLR on July 15, 1999. This was almost immediately followed by motions by CLR and J.P. Morgan during July 1999 to dismiss the claims against them in their entirety.

**Minerals and Metals Corporation** ("Global"), **R. David Campbell** ("Campbell") and **Bipin Shah** ("Shah") (collectively Global, Campbell and Shah are referred to sometimes herein as the "Global defendants") which paid a Settlement Amount of Sixteen Million Five Hundred Thousand ($16,500,000) Dollars.

Petitioners were, objectively, undertaking substantial risks as to whether they would prevail on these new claims. There were at least three categories of such risks:

(a) the substantial risks of proving the underlying alleged manipulation;

(b) the substantial risks, which were greater than the risks undertaken regarding the earlier broker-banker defendants (Merrill Lynch and Morgan Stanley), of proving that J.P. Morgan and/or CLR participated culpably in the underlying alleged manipulation; and

(c) the risks of proving any damages.

The risks on the subject of damages were complicated by the prospective payout from the original settlements of 100% of claiming Class members' losses and the resulting partial (or total) offset to or in satisfaction of such damages.

Affidavits have been presented here indicating that the plaintiffs' Lead Counsel devoted approximately 9,701.02 professional hours of services to this case between July 10, 1999 and May 10, 2001. Multiplying this time by the standard hourly rates which that firm presently charges produces a lodestar value of $2,851,816.50 and adding to that the time spent by counsel other than Lead Counsel produces a total lodestar of $2,885,609.50.

In the course of negotiating the Settlements, Petitioners demonstrated to counsel for J.P. Morgan and CLR that plaintiffs had pulled together from many disparate sources evidence that could be argued to show the following: (a) Hamanaka was operating in a criminal manner (and had been sentenced to eight years incarceration); (b) at numerous points in their respective dealings with Hamanaka, J.P. Morgan and CLR had accommodated Hamanaka in unusual ways; and (c) at the very same time as the accommodations occurred, there were newspaper reports, internal memoranda or other written indications to defendants that Hamanaka was manipulating copper prices.

Defendants' counsel had a number of contrary explanations for such evidence (and alternatively argued that their motions to dismiss would be granted). Also, CLR aggressively attacked the credibility of key witnesses, and was able to show that CLR had apprized the LME of much of what was transpiring. However, the credibility of witnesses and the weighing of conflicting inferences presented trial issues. Thus, Petitioners refused and effectively resisted defendants' attempts to have plaintiffs dismiss the claims against these defendants.

Further, plaintiffs were able to preliminarily settle the claims against the J.P. Morgan defendants on October 15, 1999. To accomplish this, Counsel for the plaintiffs negotiated and prepared the documents for the settlement and prepared the memoranda for preliminary approval thereof.

In the following period, January 1, 2000 to December 31, 2000, CLR moved the Judicial Panel on Multidistrict Litigation to transfer this case as a "tag-along" action to the Western District of Wisconsin. Opposition papers to that motion, and oral argument successfully argued to the Panel against such a transfer. English solicitors were then consulted in connection with plaintiffs' claims against CLR and letters rogatory for discovery were issued from the president of the London Metal Exchange. Discovery of Hamanaka in Japan was pursued.

CLR moved to dismiss the amended complaint and exhaustively opposed class certification. This Court imposed tight deadlines and intensive work by the plain-

tiffs resulted in filing reply papers on their motion for class certification and a comprehensive memorandum in opposition to the motion to dismiss. The motion for class certification was largely granted, CLR's motion to dismiss was substantially denied and a further tight case management deadline was set. An unsuccessful attempt to appeal the Court's class certification decision was made to the Second Circuit and the application to the Appellate Court to stay the trial herein was opposed and was denied.

Preliminary preparation began for trial, including drafting of jury interrogatories and charges and damage presentations, were undertaken. A critical difference had arisen between the status of the claims against CLR and what had been the status regarding the claims against the earlier parties: the Court and parties knew that claiming Class members with valid proofs of claim would receive a payout of a very high percentage of the high measure of their actual damages (which has, in fact, turned out to be a 100% of the high measure of each claiming Class member's damages).

Thus, in these changed circumstances (a) the Court ordered CLR and plaintiffs to engage in settlement discussions, and (b) plaintiffs and CLR finally negotiated and agreed on January 9, 2001 to a binding settlement agreement which was preliminarily approved on February 9, 2001.

Meanwhile, in response to the supplement that was made to the Sixth Amended Complaint against the CLR defendants, three of the defendants moved to dismiss for lack of personal jurisdiction. Their motion was opposed successfully.

Protracted negotiations with the CLR defendants were then conducted, which ultimately culminated in the agreement of settlement dated January 9, 2001.

By March 22, 2001, the parties had completed a Class Notice which was sent out as directed by the Court between March 27 and April 17, 2001.

The Lead Counsel during the period here involved incurred a total of $571,273.85 in necessary expenses the detail of which has been reviewed by the Court.

Substantial notice of all of the foregoing resulted in the Notice to Class members from whom there has been no objection made either to the procedures that were followed or to the request for compensation which is set forth in the papers.

Plaintiffs' counsel have submitted a Declaration of Professor Franklin Edwards in support of their current fee application. Professor Edwards is the Arthur F. Burns Professor of Free and Competitive Enterprise at the Columbia Business School, Columbia University in the City of New York and has been on the Columbia University Faculty since 1966. He has a law degree from New York University and a Ph.D. in Economics from Harvard University. He has taught graduate courses dealing with the economics and regulations of futures, options, and derivatives markets at the Columbia Business School for over thirty years and is the co-author of Edwards and Edwards, "*A Legal and Economic Analysis of Manipulation in Futures Markets*," Fall 1984. He has also written extensively on the regulation of futures markets and has a vast experience in the field all detailed in leading academic journals dealing with futures markets. He was retained by the plaintiffs in this action and consulted extensively with them during 1998. He then reviewed the documents and records set forth in his previous affirmations and deposition regarding the class certification issues.

Based on his review of the foregoing materials and his involvement and famil-

iarity with this case and the respective periods of its pendency and by his expertise in the legal and economic issues relating to price manipulation on commodity exchange markets, Professor Edwards has formed the following opinions.

Professor Edwards believes that this case has resulted in significant societal benefits, greatly promoted truth and honesty, and deterred price manipulation and fraud in the commodity exchange markets in the United States, and has placed investors harmed by manipulation in the commodity exchange markets in a better position to seek redress for their harms.

The Professor states that prior to this case there was no decision recognizing fraud on the market in commodity futures, and the longest class action that had been certified in a commodity futures price manipulation case involved a matter of weeks.[2] In addition, never to Professor Edwards' knowledge had there been alleged a supposed price manipulation involving a chain of causation of price transference from a foreign market (here, the London Metal Exchange copper forward contract market) to a U.S. commodity exchange market (here, the Comex copper futures market).

In Professor's Edwards' opinion these cases changed all the foregoing, particularly through this Court's reported decisions:

- upholding the sufficiency of RICO claims based upon application of the efficient market and fraud on the market doctrines to the commodity exchange markets. *In re Sumitomo*, 995 F.Supp. 451 (S.D.N.Y.1998). Now that these doctrines have been (correctly, in my judgment) applied by this highly-respected Court to the commodity exchange markets, it will be very diffi-

cult to "set back the clock" on their applicability in subsequent cases.

- certifying a litigation class that defendants contended to be (and in my opinion is) unprecedented in breadth and length. *In re Sumitomo*, 194 F.R.D. 480 (S.D.N.Y.2000), *petition for leave to appeal denied, In re Sumitomo Copper Litigation*, 00–8020 (2d Cir. Sept. 26, 2000). The practical and flexible definition of what constitutes manipulation and other reasoning by this highly-respected Court, and the Second Circuit's subsequent order leaving in place this ruling certifying a lengthy class, will also make it very difficult to "set back the clock" and limit to a matter of days or weeks the certified classes in subsequent commodity exchange markets cases.

- upholding the sufficiency of RICO and other claims against defendants for an alleged manipulation which they argued to be (and in my opinion is) of unprecedented alleged breadth and duration. *In re Sumitomo*, 104 F.Supp.2d 314 (S.D.N.Y.2000).

- upholding the Court's personal jurisdiction over foreign defendants, Messrs. Levett and Vincent, whose manipulative acts allegedly occurred in part here in this District but whose motion to dismiss had been granted in another court in a different case alleging manipulation in the copper market. *In re Sumitomo*, 120 F.Supp.2d 328 (S.D.N.Y.2000). Given the globalization of the markets, I think that this decision will become very important in holding foreigners who allegedly manipulate our markets responsible for

---

**2.** *In re Soybean Futures Litigation*, 89 C 7009 (N.D.Ill.1994) (approving Dec. 27, 1993 Report and Recommendation); *Gordon v. Hunt*, 98 F.R.D. 573 (S.D.N.Y.1983); *National Super Spuds, Inc. v. New York Mercantile Exchange*, 77 F.R.D. 361 (S.D.N.Y.1977).

their acts (and, ultimately, in deterring them from manipulating).

Parenthetically, Professor Edwards notes that it is his further opinion that the series of ground-breaking decisions issued by this Court, in this case, have worked the greatest improvement in the laws governing the commodity exchange markets of any single case to date.

In brief, it is the opinion of Professor Edwards that plaintiffs' attorneys have done an excellent job and should be rewarded commensurately. He states that apart from the underlying manipulation, Class Counsel faced the risks proving that CLR and/or J.P. Morgan culpably participated therein. He says that given Hamanaka's written assurances, this was very difficult. In sum, Professor Edwards says that the social gains from the outcome of this case are incalculable, and plaintiffs' counsel should be rewarded for helping to bring about this result.

While plaintiffs' believe that the award of the fee stated in the Class Notice (i.e., ⅛ of the current value of settlement amount) is justified, their request is merely for a reasonable attorneys' fee in light of the absence of objections from the Class, the precedents referred to in cases dealt with by this Court and the standard other factors under controlling case law.

The lodestar value, the market value of the services, produces a total amount of $2,885,609. In addition, an itemized listing of the firm's expenses reasonably incurred between July 10, 1999 and May 10, 2001 (set-forth in the papers) amounts to a total of $571,274. More than forty percent of such expenses involve document photocopying which was incurred in a way that helped with the prosecution of the claims now being settled (among other things, more than 2.5 million pages of documents were inspected after July 9, 1999 and this led to significant photocopying

expenses); almost thirty percent of the costs were incurred for expert witness fees which helped the prosecution of the claims now being settled because of the expert-intensive issues involved; and more than thirteen percent of the expenses were for depositions transcripts, travel and hotel expenses (to London, Phoenix and elsewhere); and finally more than twenty thousand ($20,000) dollars of the expenses were for computerized research. In addition to the expenses of Lead Counsel of $571,273.85 there was expended $671.16 by all other petitioning counsel.

While, all credit is due to Lead Counsel for their management of these extraordinary cases, their path was smoothed substantially by favorable decisions on key applications sought and obtained herein. It was the objective to obtain such decisions but that is what the lodestar in this case pays for.

An Award herein of the lodestar or market value of the additional services, under all the facts and circumstances involved in this auxiliary phase of the initial litigation, is the fair, reasonable and adequate Award that should be made in this Court's Opinion. The risks and record-breaking results achieved by Lead Counsel have been appropriately rewarded in the original allowances of compensation awarded in connection with the earlier settlements. There is little need to extend the allowances on the present application by adding multipliers to the lodestar Award. The use of the facts and the law established on the earlier phase of the case to the supplemental settlements supports a conclusion that the later services are to be calculated and rewarded at market rates.

Accordingly, it is the judgment of the Court that adequate recognition of all relevant factors and the monetary appraisal thereof, will be appropriately rewarded by

an allowance of compensation to Class Counsel in the full amount of their submitted lodestar, namely, $2,885,000. plus reimbursement of the expenses which they incurred, namely $571,274.

Seventy-five percent of the lodestar and the whole of the expenses shall be paid to Class Counsel out of the Settlement Fund within forty days after approval of the settlements and the withheld balance of 25% shall be payable along with and upon final distribution of the Class Settlement Fund to the Class Members.